in which they're listed, United States v. Michael Stephan Prime. You may begin. Good morning, Anatole, and on behalf of Mr. Prime, counsel. Thank you, Mr. Court. This case involved a rather complex set of facts that boiled down to what was really not a very complex fraudulent scheme. And the fact that a fraudulent scheme occurred was not the problem at issue at trial, but whether and to what extent my client, Michael Prime, was involved. Mr. Prime vigorously denied his involvement in this scheme, and his credibility as a result was critical in his defense of this case. In light of that fact, the perhaps most egregious error in the record below was due to simple inadvertence. Unfortunately, it is not an inadvertence that can go unchecked. You're talking about the information that went into the jury? I am, Your Honor. Let's get right to my bottom line, at least. It seems that we have a finding by the trial court that none of the jurors was exposed to the information that you're worried about. What are we supposed to do with that? I mean, it doesn't seem to me that that's clearly erroneous. Is there any information in the record at all that suggests that the jury saw the information that shouldn't have been in there? Your Honor, I think that you have to break that down to look at the various sets of information that was put in and the priors. That seems to be the best. The priors seems to be the most egregious. But also, the priors was the only thing you raised. I'm sorry? The priors was all that was raised in the trial court. I don't believe that's accurate, Your Honor. I believe that the motion did address and they addressed orally in discussions with the court the issue of, and in writing in the written motions, the issues of the additional money orders, e-mail chains. That was not my impression. I thought it was quite specific about only the priors and the Sean's priors, but nothing else. No, I think that all of those were, in fact, raised, Your Honor, and certainly the issue of Ms. Storr's handwriting analysis report. So looking at those three different things, including the priors. Focus on the priors. I think that's the case. I think that in order to look at the findings, and I do believe that the Court's finding was erroneous in terms of determining that there was no reasonable probability that anyone saw this information or that it could have impacted. And that is because of the predicament that the Court found itself in when the jurors were loaded down with hundreds of exhibits and asked, well, gee, can we have a list of what we weren't supposed to see, and reasonably the Court said, no, we can't point that out, that's going to cause a problem. They were in a serious bind, and all they could do at that point was inquire after the verdict, after that information had sat in the jury room for three hours, whether anybody recalled, after three days of deliberation, if they recalled any of these exhibit numbers, and the judge says, I realize those numbers will mean nothing to you. Kagan He didn't only say numbers. He also said he also went on to say, yes, Your Honor, you're correct, he went on to say that these would have been things with a superior court heading, and they would have talked about prior convictions, and the jury didn't just said nobody recalled at that time. That, to me, is not a clear enough finding that there was simply no way anybody was not on the master list. And I think that's a clear point that the jury didn't want to make, was that they thought when you have to recall. Roberts People didn't say we don't remember. I mean, you're using the word recall. It was more definite than that. The judge stated, I'm going to ask this question of the entire jury, and if anybody says yes, please raise your hand. Has anybody else come across an exhibit that was not on the master list? And then the court noted there was no hands that went up. Harrington And, Your Honor, my position on that is that the jury simply was in an impossible position to know whether they saw anything that was not on the master list. Roberts Yeah, but we have a finding of fact, basically, by a judge that nobody saw this stuff. Harrington I agree. Roberts And it's clearly erroneous, only because you think it was impossible. Harrington I think the judge acknowledged that it was impossible. And on the record earlier, he says, I realize that the jury would have no way of knowing if they saw something that wasn't on the list given the amount of exhibits we have given to them. He tries to go back and fix that. He says there's no way they could have known. He acknowledges that reality. He then tries to fix it after the verdict by being more specific about these particular documents regarding the convictions. But the information that he asked was, you know, do you have information about the prior crime? There would have been a superior court heading and a number. And to me, that is not enough of detail and specificity that we can know for sure when we have to – when we look at those exhibits and we look at what was in there and know that a jury could have been flipping through and seen the fourth page that said that he's not to have contact with anyone at the Foursquare Church, that this crime involved church members. Something as, you know, minimal as that that could have been glanced for a moment could certainly have had an impact. And the jury may not have realized it was the document the judge was talking about. Do we – we do know that the jury rummaged through the exhibit boxes sufficiently to find the Storer report. Yes. Do we know in what order they were – I mean, is there any way or surmise from that whether they had to have taken out of the box at least the conviction documents? Your Honor, I have – Were they in the same box? Were they in order? What was the – I was not trial counsel. I have no way of knowing that, what order the exhibits were presented. Well, I think they were in – were the exhibits close to each other in number? Would they have been in order? Do you have any of that? I believe that the – I believe that the convictions were exhibits number 910 through 914, and the – the handwriting, I think, were 811, something like that, 814. We don't have any evidence. So I don't think we have any way to show for sure where they were at. They were certainly there. And I think that what is – what is driving the problem underlying the situation is that we all know, as jurors and as human beings, when we make decisions, we are stacking information and assessing things, and there is at some point for all of us an issue. But what – so what would have been prejudicial had they seen it? So let's assume they saw it, whatever. I just – I – and it's my view, unless you can tell me why not, that the only issue that was raised here were the convictions. If you want to show me otherwise, you can do that. But assuming that for the moment, what about those convictions was sufficiently prejudicial? Your Honor, first of all, they showed, and I believe, as Mr. Miyake pointed out in his brief, the government's brief, that there was some redaction of the aspect of an incendiary device being used. But my understanding is that what was also shown on those documents, they were multiple pages. There were a number of things that could have been problematic for a juror. First of all, the fact that there was a conviction that may have been different from what they heard of, that may have been more detailed than they were apprised of at trial. But you only had five prior convictions, felons. Yes, but that this was – that this was a situation where they were allowed to then possibly see what the punishment was. A juror may have felt it wasn't sufficient punishment, may have felt they were obligated to do something more. You are really often to – into speculation on top of conjecture on top of speculation at this point. Well, Your Honor – Your Honor, but what we have to do here is look at what reasonable possibility is there. And I don't think what I'm saying is an illogical leap. That's what the Court requires. They know he had a gun, they know he had a stun gun. And that's exactly an issue that points to the prejudice, Your Honor, is that one of those convictions says, ineligible to possess firearms, stamped right on front of it. And so that is an added aspect of prejudice to Mr. Prime, that the juror saw that and then realized that not only was this a problem here, but he was violating this order, an order that they should never have seen. That is a clear risk, and we can't ignore that. And we don't have sufficient proof beyond a reasonable doubt that there was no chance that it could have had an impact. We don't have to prove that it did, just that there was a slight chance. That doesn't require a huge leap of logic. And I don't believe these require a huge leap of logic. We're chewing up a lot of your time with questions. I don't want to stop you from addressing anything else. Okay. I think in terms of, obviously, those convictions are the most serious problems. But you have to also look at the cumulative aspect, that we also have these additional pieces of information. At my break, Your Honor, I'll try to point that out to you, where that was found and raised. And the store report, the handwriting report, was in there along with these fingerprint reports. And while the government's position is, well, those were simply cumulative, the fact remains that the jury was looking for what – how to weigh this evidence. And what they got was something they shouldn't have received, which was a report that has the Secret Service stamp on it. Was the handwriting – did the government attempt to introduce the handwriting report and it was not allowed to introduce it or just to try to introduce it? What was the history of that? Your Honor, I'm – I don't recall at this point from the record if it was attempted to be introduced, but it was certainly not admitted. The challenge by this article is obviously that it is something that was just written  They would be knocked out by the court, by a court for a legal reason. Or was this one of the documents that was simply marked for identification and never offered as evidence? I don't know that, but I don't believe that the test requires us to resolve that fact. Yeah, but I think it had to do with whether there was any to think it was prejudicial. I mean, if there is – if the thing would have been admitted had it been offered and, in fact, it was simply cumulative, what differences does it make? But if, on the other hand, there was some reason that it wasn't admitted and now it's in by accident, then that would matter. I don't think that typically it would have been admitted because of the added weight that it would give when the jury is supposed to base their decision on the testimony. Well, but now you're just – now you're in the I don't think category. You can't tell us whether it was kept out or not. I don't know, Your Honor. Maybe the prosecutor can. Perhaps he can. With regard to the cumulative aspect of those exhibits, the question that this Court has to look at is, is there a possibility that some jurors seeing any piece of that information could have been impacted? And as I started to say earlier, when we make decisions and we're balancing credibility in the weight of all of the information in front of us, at some point for every person there is something, the final straw that breaks the camel's back, the final nail in the coffin, that pushes us. In this case, we don't know if any of that information may have pushed us. And while this was clearly an unintentional mistake, it was a mistake that resulted in that. What is the legal standard we're applying with regard to the degree of prejudice that has to be shown? Your Honor, I believe the standard is that the government has to prove beyond a reasonable doubt that there was no reasonable possibility that the evidence could have had an impact, and I don't think they've done that here. They have not shown us that beyond any reasonable doubt, no logical explanation I think that the courts can consider the evidence as a whole in terms of the potential prejudice. But again, the question There was a fairly substantial amount of evidence indicating that they were guilty. Certainly, there was a lot of evidence, Your Honor, and the question of whether  that there was a reasonable possibility that there was a reasonable possibility about the vigorous opposition to that evidence is tied up in not only this aspect in terms of was can we be assured beyond any reasonable doubt that any piece of this information may have swayed a juror, may have pushed somebody to the edge. All of that is really that you're complaining about here, at least with respect to the prior record, the prior conviction. It really just goes to their discredibility. Well, I think it is. I think the credibility issue is crucially, Your Honor, but I also think there is more to that in terms of the discrete facts that could have been inflammatory to any particular juror when you look at the details that someone may have flipped through and seen, as I stated earlier. So I do think that it's not just that they knew there was a conviction. The discrete facts in those documents, do you suggest, might have been inflammatory to the juror? As I said, the fact that perhaps somebody didn't feel the punishment was sufficient, that there was You said there might be discrete facts in those documents that might be inflammatory. That a juror may feel that the conviction that was listed, that the punishment that's listed on the next few pages of the conviction wasn't sufficient. That a juror may have been concerned that Mr. Prime was involved in a crime involving a church. That those are the kinds of things that if it's going to come into evidence, at least two things need to happen. One, the jury needs to be vardiered about their prejudices there, and two, Mr. Prime deserves the right to cross-examine that evidence. And the jury know about his prior convictions that were, he admitted that he had been convicted of five crimes. But the jury was certainly not aware that he was involved in a situation involving a church and the incendiary device, and they were also not aware of the details of his association with Mr. Cahill, who was, as we know, mentioned at trial, but not a witness. So I do think that those pieces of information were possibly prejudicial and do not require the leap that would be necessary to say there's no way they could make an impact. Unless you have additional questions, I'd like to move on to the counsel issue briefly before I take some time for rebuttal. With regard to the issue of counsel, I think that the government and I agree on the aspects of the legal standard here. Kagan, are you going to argue the handwriting issue, or you don't want to do that? I will try to discuss that briefly, Your Honor. Two points that I'd like to make about the counsel issue first. The original motion, certainly the Court did make an inquiry off the record. Our position is that that inquiry was not sufficient because of the fact that as Mr. Prime showed up for court, his lawyer had not discussed the motion with him, had not prepared him that he was going to have to present his position to the case. The lawyer said I'm perfectly ready to go. They asked the client. The client said, my parents don't like him. I think that's it. Anything else, or does it boil down to your parents don't like him? And it boiled down to, my parents don't like him. But Mr. Prime did try to explain more to the Court, and the Court said he wasn't going to hear it. And that, well, well, I think that particular issue in that first motion is that there is potential that one could go either way on it. Had the judge inquired further, I think he would have found a more serious problem. We move then next to the second motion, where the judge failed to have any inquiry of Mr. Prime or Mr. Covell whatsoever. That was prior to trial, when he tried to have Mr. Rossellini substituted in. And I don't think it was the very day of trial, Your Honor. And the issue, Your Honor, is that Mr. Rossellini was wanting to substitute in, and while I understand that timeliness is certainly a problem and the Court can consider timeliness, the Court also has to consider the conflict in the case. There was a some sort of written documentation submitted to the Court a couple of days before the trial started, and the judge was not available. Right. And so they showed up on trial. But you're right. The hearing was actually that morning. Raised that morning, the very morning of trial. But still, even two – let's assume that the judge sought two days before. But the issue, Your Honor, is whether at that time there was still a serious conflict and the Court never inquired. They just simply said that this is too late and I'm not going to – and they did not have the inquiry. The government actually requested that the Court hold an inquiry outside of the prosecutor's presence, as was required, and that did not happen. Were there allegations that there was a conflict or that he just wanted new counsel? I think the allegations of the conflict are clear from early on, that Mr. Prime is alleging he's not – No, no, no, no, no, no, no. Not the allegations were clear from early on what was said at that time. He is requesting new counsel. And when Mr. Prime was not allowed to express that, and the Court is well aware that Mr. Prime has said there is a problem with counsel, and a previous motion is a factor that the Court should consider. I'd like to move on just briefly for a moment to the handwriting. Your Honor, there is – Judge Zlaznik's decision is very thorough on this matter, and it is the defendant's position that while this area is open and has not been decided by this Court, that the reasoning behind those decisions which do not allow the handwriting experts in, the fact that there is not the external analysis done by a noninterested party, the fact that – We know we have the First, Third, Fourth, Sixth, Eighth, and Eleventh Circuits saying this kind of evidence is admissible. Which circuits say that it's not? I think that the district courts are the ones that are still finding that it is not necessarily, and those are the courts that are holding the hearings and hearing this. And you're right, Your Honor, there's not – Six circuits say this evidence passes the Daubert test. Your Honor, at the same time, many of the courts have held – But half the circuits have said or have said that it's not an abuse of discretion to conclude otherwise. Your Honor, I agree, but this Court still has the authority to look at it carefully on its own, and we would simply ask that, Your Honors, do that and look at the reasoning, and in particular, to at least limit – Did Judge Zlaznik actually find that this meets the Daubert test, or did he find  that this meets the Daubert test, but it's so well accepted that, in the meanwhile, we should let it go? I think his feeling was that under the – he talked about the fact that there may, in fact, be additional information that is needed and warranted, but under the facts of this case and this particular handwriting expert that he had, he felt there was sufficient information to uphold it. I'd like to reserve the rest of my time for about 11 minutes. Thank you, counsel. Thank you. Good morning. I'm Bruce Miyake, I represent the government on this matter. Counsel, I'd like to start with the issue regarding the exhibits. It's the one that troubles me the most, and I'm sure it's the one that troubles this Court. Were you counsel at the trial? I was counsel at the trial, Your Honor. How did the exhibits get into the jury? I'm sorry? How did these exhibits get into the jury? They were your exhibits, weren't they? They were our exhibits. It was a horrible mistake, Your Honor. It was a lapse of judgment on my part. We should have checked them beforehand. As I read the record, the judge asked the attorneys to meet and confer and go over the exhibits and make sure every one of them that's going into the jury room is properly marked and admitted, and there's a little... I agree. We were given every opportunity... ...that we followed as district court judges to make sure that this little problem didn't happen. Absolutely. And it was... Sometimes critical evidence is excluded and can erroneously get back into the jury room. Well, I certainly understand the Court's comments on that, and we had the opportunity. We simply failed to do that. What happened? You say you failed to do it. You didn't show up for the opportunity? Tell me exactly mechanically what happened. The exhibits had all been pre-marked and put in chronological order in the boxes. We kept them together through the trial, both the ones that were admitted versus not admitted. We thought about this even before the closing arguments because we came up with a new idea that the jury room would have somewhat of a guide. So we thought about doing that. When we brought them out on the morning of trial, the end of trial, because we used them for closing, we just simply forgot to do it. I can't explain it. You just handed the whole box to the clerk, or the clerk had the whole box and the clerk then just put the whole box in the jury room? That's essentially what happened. Well, you learned a valuable lesson. Most trial lawyers learn this pretty early. Clerks don't really understand what's going on. They're great. They have lists and everything like that, but the final responsibility for exhibits is on the lawyer. And I understand that. I wouldn't be standing here. Spread the word. Believe me. Believe me. It's a very painful lesson, and I wish I wasn't standing here having to address this in front of you. And quite frankly, I'm very ashamed and embarrassed by this whole matter. It was a, because it tainted an otherwise very strong case that we put on, and Judge Lassnick had been mentioned that. But I think if you could get beyond the shock of this horrible lapse of judgment on our part, and you look at the nature of these exhibits and weighed against the overwhelming evidence that the government presented in context of what the issue was, which was not whether or not these crimes had been committed, but whether the defendant had participated in these, Judge Lassnick did not abuse his discretion in finding that. I think that's the way to look at it. Can you answer the three factual questions that came up before? One is, was the, was any of this evidence admitted and, sought to be admitted and not admitted, as opposed to simply not sought to be admitted? No, Your Honor. We didn't offer some of the documentary evidence simply because we felt that we had reached a point where there were sufficient other similar documents that had been admitted. We didn't call certain witnesses, victims, that we would have admitted those documents through. But the Sean, whatever his name was, conviction wouldn't have been admitted. We know that. That's correct. Because although the defense had certified him as a witness, he was never called as a witness, so we never would have admitted those. We mark the judgments regarding Mr. Prime in event that he were to testify, as he did, and then deny that he had those convictions, but he, in fact, admitted that he had those convictions. If he, on cross-examination But there was another conviction in there, although it was blacked out. That's right. The incendiary device. Secondly, do we know anything about the order in which the material was in the boxes such that, since we know they took out the Stora exhibit, what would they have had to go through physically in order to get to the Stora exhibit? Well, as I indicated earlier, we kept the exhibits in chronological order. As I remember, there were two, maybe three boxes in which we had put our exhibit folders in that had the exhibit number and then the actual exhibit inside there. As is pointed out, this Stora's report is 811 and 812. To have gotten to the criminal judgments, they would have had to have gone through at least another 10 to 15, 20 other exhibits, which were photographs, which were also in the box as well. Those were exhibits 9, I believe they start at 910 through 914. So they would, if they were going through them chronologically, because, quite frankly, we don't know. Jurors could have been jumping around, but we do know that this happened. They asked for a Stora's report, and then within a minute or two, they found it. We are called, we're told what happened, and it's at that point that the light goes on, Jesus, we made a mistake. And the last thing is, what is your understanding about what was challenged at trial? In terms of? Was everything challenged at trial or just the convictions, with regard to the assertions of prejudice from exposure? Well, his, the, none of the content of the exhibits were challenged at trial. How could I understand that? I mean, what was the motion for mistrial? Oh, the motion for mistrial was, as you had pointed out, really the focus was. Was the focus, or was that all they ever mentioned? No, they, what happened is he made a general, we move for a mistrial. The Court denies it because the jury has not even finished deliberating. After the verdict comes back, he says, well, we've, we've, I forgot the word he used, but basically sharpened what we're saying, and it's really the criminal judgments. Now. So then when the judge asked the jurors specifically, asked them specifically about the convictions and nothing else, right? Yes. And that's exactly what happened. The record here clearly establishes that the jury did not see those exhibits. Well, that's not very clear. If you really wanted to know whether or not they'd seen this, if you really, I mean, if there was some document that was really highly prejudicial, and you really wanted to know whether they saw them, you wouldn't ask a mass of people sitting in a room together something as vague as that and just take silence for an answer. Well, we. We sit down with each individual person, as is done in foie d'oeuvres with regard to exposure to publicity and so on, and you would talk to each of them. You wouldn't just do this massive thing. I would agree that that probably is the best approach to have taken. But the approach that was taken, I think, does establish that the jurors did not see it. With Judge Lasnik, he actually mentioned the exhibits by number. He described what they were, that there was a heading of Superior Court or Snohomish County Court. And he even, during the exhibit, held it up and asked them, do any of you recall seeing these exhibits? Do any of you, raise your hand if you do. No one raised their hand. He then, he didn't just stop there. He then asked specifically, do any of you recall seeing the exhibits of Michael Prime, the convictions of Michael Prime? No one raised their hand. He then moved on to Sean Cahill. Again, no one raised their hand. I agree with the Court. At a minimum, if you really want to know the answer. You know, a mass psychology sets it. So if you want to know the answer, at least go down the line and say, did you, did you, did you. I agree that in hindsight, it would have been better to have asked each one of them. Perhaps it was the Court trying to be. I'm going to admit that they screwed up the trial by looking at something they weren't supposed to see. That's, that certainly could be. But one thing that the judge said on the record is, when he asked that, he says the record doesn't show the look on the faces of the jury. And none of them, when, when asked that question, they look confused. No, we, we didn't see it. And, and he makes mention of that. So I think he certainly was satisfied, given their physical responses based on their facial expressions, that they did not see it. But I think the record does establish that they didn't see it. But even if they did see those exhibits, given the other evidence that was admissible, it's, it's not prejudicial. It would have been cumulative. Mr., the jury knew that Mr. Prime had been to prison. They knew he'd been to prison for five felony convictions. In fact, not only did he admit that, but two other witnesses that we had testify, admitted that, or testified to that. David Heastand, who was his co-conspirator. Jeff Hardy, who was another co-conspirator, testified to that. There was also other prejudicial information that was in the record. They knew that he armed himself. Jeff Hardy had testified about an incident that he had had with him, that he was scared that he was going to be threatened and that he knew that Mr. Prime had obtained some stun guns. So there was nothing prejudicial in those records themselves. If Mr. Prime – the government could have even sought to introduce those if Mr. Prime had not mentioned that. We could have introduced a certified copy under Evidence Rule 609, because that would have, that extrinsic evidence would have come in that way. So it was otherwise admissible, but he admitted it. There was no need to do that. Mr. Covell. Pardon? Who's Mr. Covell? Mr. Covell is the attorney. Yeah. And at the end of all of this, the judge says, and do you, any of you recall seeing documents about Mr. Prime sentencing on his prior criminal records at all? No responses to that. Mr. Covell, is there anything else you want me to inquire the jury during the polling process? Mr. Covell, I think the courts addressed the issues. So he was given an opportunity to ask for individual polling and didn't take it. That's exactly right. That's exactly right. He was – the judge had asked the questions. The defendant's own attorney was given the opportunity to ask for further inquiry, but he denied – he didn't see a need for it. And in fact, even in – there was a subsequent motion for a new trial prior to the time of sentencing. He essentially concedes that the jury did not see that. He then addresses – There's a clear acknowledgment that none of the jurors saw the certified copies of convictions of Sean Cahill, first of all, as Mr. Covell says. So he seems to be repeating Mr. Covell's acknowledgment that they didn't see the certified copies of the convictions. He also points out that the stuff was cumulative and there was nothing in here that was inadmissible. So that confirms the idea that nothing got to the jury that had been ruled inadmissible. That's absolutely correct, Your Honor. He then goes on to say – Well, the Cahill convictions were inadmissible, actually. They were not admitted, but they were inadmissible. Yes. That's correct. Cahill documents just in and of themselves would not – were inadmissible just in – He's got the rest of it there. And then he goes on to say, as the sitting trial judge, this is one of the strongest prosecutions the Court has seen. The evidence was absolutely overwhelming. There is no reasonable possibility that could have affected the outcome of this case. Do we give any deference to that observation by the trial judge? Yes. The Court should give substantial deference to the Court's conclusion that this did not. Now, it's not binding on the Court, but as this Court has indicated in prior decisions, it's the trial court who sits and hears the evidence, who sees the witnesses. And therefore, those comments or those findings should be given substantial weight and decided. What is your understanding of the standard here? There's language thrown around in the case. Is it beyond a reasonable doubt, reasonable probability, beyond a reasonable doubt that it wasn't a reasonable probability? What is it? My understanding is that it is a reasonable – whether or not there was a reasonable possibility that it could have affected the verdict. Now, that has been interpreted by some courts to be – well, it is a very stringent standard, and this Court has interpreted in other cases to be harmless beyond a reasonable doubt. So the government has to show beyond a reasonable doubt that there's no reasonable possibility that it affected the verdict? Well, I think what the government has to show is there – yeah, that the government must show beyond a reasonable doubt that the introduction of these exhibits was harmless based upon the context of the trial and the other issues. And there – and so I think that – that is the standard. Where does this reasonable doubt come from? Well, Your Honor, it's come up in the context of a habeas petition, State habeas petition. That's where that language has come up. And I think the Court has then morphed that into a – Well, a State habeas petition, that couldn't be the standard. It would have to be a direct standard at worst, right? Well, but they've used that in State habeas petitions. I mean – It's a Chapman standard, isn't it? It's a Chapman standard. It's a Chapman standard. But why is it a Chapman standard when this is an evidentiary problem? I agree. I think that the reason why they used that standard is to illustrate the – what a stringent standard it is for the government to meet. I think that is why they used that language. But even under applying that stringent standard to the case at Bard here, again, you have to look at the entire trial context, the other evidence that was admitted, the issues at trial, and determine whether or not this was prejudicial. And again, the judgments, they break down into three categories. The judgments, as this Court has pointed out, there is – the Court's finding that the jury didn't see that. And therefore, there could be no reasonable possibility that those affected the verdict. Well, what about the – this is awfully high standard, if that's really the standard. What about the expert's report? It wasn't admitted, and they seemed very anxious to see it, right? Yes. That was the one – the one category of evidence that went back that we know that the jury saw. And they care to see. They wanted to see. That they wanted to see and actually had it for some period of time. We don't know the exact period of time it was anywhere from. How can you say that it didn't make a difference that they had it when they seemed very anxious to have it and seemed to think that without it, they were at some disadvantage? Well, I think that you have to look at what was in the handwriting report. And the handwriting report was merely just a summary of all the items that she had accumulated to – to analyze, and then her conclusions. There was nothing more beyond that. There was nothing in there that was different than what she testified to. So in that sense, it was cumulative. But why did they want it? Well, Your Honor, there were a number of exhibits. The handwriting exhibits that she analyzed were Exhibit 500, Q1 through 70. We refer to these repeatedly throughout the trial. Perhaps they wanted to take a look at that to simply confirm which of these were. So the organized way of seeing her thought process is a way for them to judge the thought process laid out more clearly than it was at trial. Is that enough to show that there's – that if they hadn't had that and instead were dependent upon the trial, they might have done otherwise? Well, I think that you can't make such a leap in that situation. There's a reasonable doubt that there isn't a reasonable possibility? Well, I understand that the standard is a little odd the way that it's developed. But we do know that it's a reasonable possibility. And quite frankly, as the Court pointed out, these were cumulative. The jury had heard testimony not only from Ms. Storr, but they also heard from the cooperator, David Eastand, who didn't identify all of the documents that Ms. Storr identified, but did testify to some. Furthermore, there was a fingerprint found on at least one of these Post-it notes that tied it to the defendant as well. I think when you look at it like that, in order for it to be prejudicial, there must be some direct and rational connection to the main issue. Did Mr. Covell point out any part of this report that we're talking about that was prejudicial, that was not part of the handwriting expert's testimony? No. Where is this report in the excerpt of record? It is the excerpts of record, I did not, it's Exhibit 811. Where is it in the excerpt? If you would give me a moment to. Is that 209? 209. It started at 209. We are at 209. Yeah. It actually starts at excerpts of record 199 and goes to 211. So those are the two handwriting reports that went back. But as this Court indicated, Mr. Covell never pointed out anything that was inherently prejudicial about what was contained in these reports. And as I indicated, if you look at it. There's nothing in the brief that I can see either. Maybe the other side can point to something in the brief or the document itself that's prejudicial. And again, there's nothing. Now, with respect to the documentary evidence, that breakdowns to about 10 exhibits, five of which were money orders and checks from victims of some of the ghost sales. Two relate to counterfeit money orders that victims had received. Email correspondence and one post-it note. Well, we had introduced numerous other exhibits, numerous other money orders that were received from victims. We also introduced numerous counterfeit money orders that victims had received. So this was not new. Regarding the post-it note from Darren McPerson to Dina Jewelers, just before that we had introduced, I believe it was a, the counterfeit money orders that Darren McPerson had sent to Dina Jewelers. Additionally, we had introduced four other post-it notes exactly the same or very similar to the post-it note that had gone back. So when you look at those, those are clearly cumulative and those could not, do not relate at all to whether or not Michael Prime was involved in this scheme or not. So those documents, even in their totality, would not warrant or support this, the district court finding that there was not a reasonable possibility that it affected the verdict. You've got just a few seconds left. Is there anything else you'd like to tell us? I think, I think that's it, Your Honor. Thank you, counsel. Thank you. You may respond. Just briefly, Your Honor, I would like to point out a couple of things. First of all, I don't think there's anything in the record that shows that the judge held up the exhibits and showed the exhibits to the jury. Mr. Verrilli. Let me ask you a question that Judge Berzon quite properly focuses on. I didn't see anything in your report, in your brief at all, that suggests that there's part of this handwriting document that we're talking about that's prejudicial or not cumulative. What about that report? What is there in that report that's troublesome? Your Honor, my position would be that, first of all, having the report is what is bolstering the credibility of the witness and allowing the jury to process it, as pointed out, in a different way. I think you're saying it's the same as the testimony, it just bolsters it? I think it has added credibility, and I think the issue that you have to focus on here is that what this rule, why this standard is so stringent. There's nothing in the report itself that's in addition to what the handwriting expert testified. I'm not submitting that there's absolutely nothing in there. Certainly What is? What is? Your Honor, I think that Have you read it? Of course, I've read it, but I've not prepared detail by detail. I think that my position is that when you have that, whether it's exactly the same or not, it bolsters the credibility of that witness and allows the jury to go through a process whereby the defendant is not allowed to cross-examine that evidence and to deal with that evidence because they did not know it went to trial. They could have gotten a readback of her evidence. I'm sorry? They could have gotten a readback of her testimony if they'd asked for it. But the report is not a verbatim transcript of her testimony, Your Honor. It is different. It could be viewed in a different way. It's not as if there was simply a waitress to have a compendium of her testimony in an organized fashion. They could have It was an easier way of getting a readback, but they could have gotten a readback. But again, Your Honor, we're speculating as to whether, as is pointed out, whether the jury may have interpreted this in a way that leaned them towards agreeing with her at a level that Mr. Prime's attorney was not allowed to deal with because they were not allowed to know if this evidence went back. But I don't know if there was anything at all in there, even an intonation that was different than how would why would it matter. Certainly there's information that is different in there. As I said, it's not a verbatim transcript. It has things broken out in a different way. She did not read from that report. And there are multiple reports in there, and they have the Secret Service stamp. Are there additional exemplars or more discussion of her methodology or anything that would make it more likely to be believed in her testimony? I can't answer that specifically, Your Honor, in terms of the detail, because I have not compared the transcript to that in a way that I can do that. Thank you. Your time has expired. The case has already been ordered and submitted. We thank both of you. Thank you. We'll get you a decision in due course. United States versus Knopfahl. I hope we're pronouncing that correctly. Yes, Your Honor.
judges: Trott, Paez, Berzon